34 F.3d 266
 Isreal TAYLOR; Dannon Mourfield; Donald Guy; Wayne Moore;
and Jimmy Jordan, Plaintiffs Appellees,
v.
Franklin FREEMAN, Secretary of the Department of Correction;
Lynn C. Phillips, Director of the Division of Prisons;
Michael Bumgarner, Youth Services Command Manager; and
Carol C. Stamey, Superintendent of Morrison Youth
Institution, Defendants Appellants.
 No. 94-6359.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 18, 1994.
Decided Sept. 9, 1994.
 
 ARGUED: Jane Ray Garvey, Office of the Atty. Gen. of North Carolina, Raleigh, NC, for appellants. Marvin Ray Sparrow, North Carolina Prisoner Legal Services, Raleigh, NC, for appellees. ON BRIEF: William McBlief, Office of the Atty. Gen. of North Carolina, Raleigh, NC, for appellants. Kathryn L. VandenBerg, North Carolina Prisoner Legal Services, Raleigh, NC, for appellees.
 Before WILKINSON, LUTTIG, and WILLIAMS, Circuit Judges.
 Vacated by published opinion. Judge LUTTIG wrote the opinion, in which Judge WILKINSON and Judge WILLIAMS joined.
 LUTTIG, Circuit Judge:
 
 
 1
 On motion by appellees Isreal Taylor and other inmates incarcerated at North Carolina's Morrison Youth Institution, the federal district court in the Eastern District of North Carolina issued a mandatory preliminary injunction on March 23 ordering prison officials at Morrison "to take the following actions by May 30, 1994":
 
 
 2
 1. Reduce the total inmate population at Morrison Youth Institution to 205 inmates, or less, and thereafter, maintain such number until the final resolution of this action. Specifically, the institution is to house no more than one individual in any single cell, and to limit the inmate population of each dormitory to the following numbers:
 
 
 3
 Aggrey, A Dorm 42
Aggrey, B Dorm 42
Bost, A Dorm 10
Bost, B Dorm 10
Bost, C Dorm 8
Bost, D Dorm 8
Edwards, A Dorm 14
Edwards, B Dorm 14
Edwards, C Dorm 14
Edwards, D Dorm 14
Edwards, E Dorm 14
 
 
 4
 2. Create and staff six new correctional officer posts, one each in A and B dorms of Aggrey building, two in Bost building, and two in Edwards building;
 
 
 5
 3. Cease the use of Bost C and D dormitories or any other dormitory housing for the use of disciplinary segregation, administrative segregation, or protective custody;
 
 
 6
 4. Devise and present to the court a plan for providing the amount of square feet required by the 1994 Supplement to the American Correctional Association Standards for inmates transferred from Morrison as a result of this order.
 
 
 7
 Defendants are ordered to reduce the population by at least twenty inmates by April 15, 1994. The defendants are further to continue such reduction by at least twenty inmates twice a month (i.e., April 30, May 15, concluding on May 30, 1994) until the population is sufficiently reduced. Such reduction must be concluded by May 30, 1994.
 
 
 8
 Order at 7-8. The trial on the merits of the inmates' claims that Morrison is unconstitutionally overcrowded and that inmates are subject to a constitutionally unacceptable level of inmate-on-inmate violence is scheduled to begin later this month.
 
 
 9
 We immediately stayed the district court's order and expedited consideration of the prison officials' appeal from the order of preliminary injunction. We now vacate that order in its entirety.
 
 I.
 
 10
 It is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities. As the District of Columbia Circuit observed in Inmates of Occoquan v. Barry, 844 F.2d 828 (D.C.Cir.1988), "in carrying out their remedial task, courts are not to be in the business of running prisons. The cases make it plain that questions of prison administration are to be left to the discretion of prison administrators." Id. at 841; see also Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981) ("[C]onsiderations [of appropriate prison management] properly are weighed by the legislature and prison administration rather than a court."); Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979) (disapproving trend of courts becoming "increasingly enmeshed in the minutiae of prison operations"); Turner v. Safley, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259-60, 96 L.Ed.2d 64 (1987). Addressing the concerns of federal judicial competence and comity that underlie this fundamental principle of federal judicial restraint, the Supreme Court explained in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), that,
 
 
 11
 [t]raditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration.... [T]his attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention.... Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have another reason for deference to the appropriate prison authorities.[1]
 
 
 12
 Id. at 404-05, 94 S.Ct. at 1807 (footnote omitted). Focusing on the comity concern, the Court observed in Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), that,
 
 
 13
 [i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons..... The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.
 
 
 14
 Id. at 491-92, 93 S.Ct. at 1837 (footnote omitted).
 
 
 15
 Even where there has been a finding on the merits that unconstitutional conditions exist, federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators. See, e.g., United States v. Michigan, 940 F.2d 143, 167-68 (6th Cir.1991) ("[I]t was incumbent upon the district court in the action sub judice to impose the least intrusive remedies available.... The trial court, having acknowledged the teachings of the Supreme Court addressing state penal institutional administration, was remiss in not fashioning its disposition in accordance with those directional dictates."); Cody v. Hillard, 799 F.2d 447, 449 (8th Cir.1986) (district court found numerous constitutional violations yet initially ordered only that prison officials "prepare plans to cure the constitutional violations" for submission to the court); Ruiz v. Estelle, 679 F.2d 1115, 1127 (5th Cir.1982) (after 159 days of trial, over the course of which 349 witnesses testified, district court did not immediately enter a remedial order, but provided parties an opportunity to formulate consent decree); Fisher v. Koehler, 692 F.Supp. 1519, 1565, 1567 (S.D.N.Y.1988) (after finding that "both inmate-inmate violence and staff-inmate violence at [the prison] have reached proportions which violate the Eighth Amendment," court decides "against the entry of an injunction adopting the specific proposals suggested by the plaintiffs at this time, before defendants have been given an opportunity to submit a reasonable plan for the court's consideration"). Cf. Strickler v. Waters, 989 F.2d 1375, 1382 (4th Cir.), cert. denied --- U.S. ----, 114 S.Ct. 393, 126 L.Ed.2d 341 (1994).
 
 
 16
 Indeed, intrusive and far-reaching federal judicial intervention in the details of prison management is justifiable only where state officials have been afforded the opportunity to correct constitutional infirmities and have abdicated their responsibility to do so. For example, in Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court upheld the district court's intrusive order for the very reason that it did not come until it was evident that prison officials would not comply with the court's earlier, generalized orders to remedy the unconstitutional conditions:
 
 
 17
 In fashioning a remedy, the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation. The District Court had given the Department repeated opportunities to remedy the cruel and unusual conditions in the isolation cells. If petitioners had fully complied with the court's earlier orders, the present time limit might well have been unnecessary. But taking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance.
 
 
 18
 Id. at 687, 98 S.Ct. at 2572 (footnote omitted). The district court had twice found that conditions in the Arkansas penal system violated the Eighth and Fourteenth Amendments. Id. at 681, 98 S.Ct. at 2568. Even in the face of these findings, the district court "[had] not immediately impose[d] a detailed remedy" but instead had "offered prison administrators an opportunity to devise a plan of their own for remedying the constitutional violations." Id. at 683, 98 S.Ct. at 2579.
 
 
 19
 In sum, sweeping intervention in the management of state prisons is rarely appropriate when exercising the equitable powers of the federal courts. This is true where conditions at the prison have been adjudged unconstitutional following trial on the merits. It is especially true where mandatory injunctive relief is sought and only preliminary findings as to the plaintiffs' likelihood of success on the merits have been made. See, e.g., Dean v. Coughlin, 804 F.2d 207, 214 (2nd Cir.1986) (agreeing that relief was necessary, but nonetheless vacating injunction imposing comprehensive dental care plan on the state's prison system as a "depart[ure] from [the] basic concepts of comity and federalism") (citing Preiser, Hutto, Procunier, Rhodes, Wolfish); Wetzel v. Edwards, 35 F.2d 283, 288 (4th Cir.1980); Godinez v. Lane, 733 F.2d 1250, 1260 (7th Cir.1984).[2]
 
 II.
 
 20
 The district court failed, as the inmates do, even to acknowledge these bedrock principles governing federal equitable intervention into the peculiarly state function of prison administration. See Blackwelder Furn. Co. v. Seilig Mfg. Co., 550 F.2d 189, 193 (4th Cir.1977) (vacatur of injunction required where district court "exercised [its discretion] counter to established equitable principles"). The district court compounded this error by taking its extraordinary action on the basis of little more than conclusory findings, which failed to consider the evidence submitted by prison officials in opposition to injunctive relief, and which likely could not support even an appropriately limited order of injunctive relief in this context. In combination, these errors confirm that the district court exceeded the limited remedial authority vested in the federal courts to direct the way in which state prison officials meet the dictates of the Eighth Amendment.
 
 A.
 
 21
 Although the district court seemed to believe that it had not usurped the discretion of the Morrison officials, it in fact deprived those officials of essentially all discretion to address the problems identified in its order. This is apparent from the face of the order itself. The order not only commands Morrison officials to reduce the overall prison population by more than thirty percent of maximum operating capacity within a two-month period,[3] but also specifies a population limit for each wing of each dormitory. Order at 7-8. The injunction not only orders prison officials to create six new correctional officer positions--which would require the hiring of as many as thirty new employees, see J.A. at 439-40--but instructs the prison where to situate those officers, dormitory by dormitory. Order at 8. The order forces prison officials to cease use of any and all dormitories for disciplinary or administrative segregation, or for protective custody. Id. It mandates that no more than one inmate be housed in any one cell. Id. at 7. It establishes a strict timetable, replete with specific inmate population reductions that are to be achieved by dates certain. Id. at 8. Indeed, the order goes so far as to attempt to define the actual square footage of space that must be allotted per inmate at any institution to which Morrison inmates might be transferred as a consequence of the court's order, id., effectively and impermissibly elevating to constitutional status mere standards from the American Correctional Association. See, e.g., Bell, 441 U.S. at 544 n. 27, 99 S.Ct. at 1876 n. 27 ("[T]he recommendations of these various [professional] groups ... simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."); Inmates of Occoquan, 844 F.2d at 837 ("Indeed, the obvious danger of employing professional standards as benchmarks is that they ineluctably take the judicial eye off of core constitutional concerns and tend to lead the judiciary into the forbidden domain of prison reform.").
 
 
 22
 Far from a restrained order that preserves to prison authorities the managerial discretion that is properly theirs, this order represents the sort of arrogation of power by the federal courts that the Supreme Court has repeatedly said should be scrupulously avoided. The district court's order, like the order in Dean, simply "went too far and too fast in imposing upon the state correctional facility its own ideas of how [Morrison] should be organized and administered rather than giving appropriate deference to the state." Dean, 804 F.2d at 214.
 
 B.
 
 23
 The district court's assumption of extensive managerial control over the prison at Morrison was premised upon conclusory findings that we doubt could support even circumscribed intervention that reserved to prison officials the broadest authority to address the institution's problems in the first instance. In fact, the inmates themselves are consigned to speculate over what facts in particular supported the district court's conclusions. See Appellee's Br. at 15-24 ("Plaintiffs here briefly review the evidence upon which each material finding of fact could be based." (emphasis added)).
 
 1.
 
 24
 The inmates allege that the overcrowding and understaffing at Morrison expose them to a constitutionally unacceptable risk of physical violence. To prevail on the merits of such a claim, the inmates must establish both that they are subject to a "substantial risk of serious injury," and that prison officials have manifested "deliberate indifference" toward that risk. Farmer v. Brennan, --- U.S. ----, ----, 114 S.Ct. 1970, 1983, 128 L.Ed.2d 811 (1994); see also Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); Strickler, 989 F.2d at 1381.
 
 
 25
 We discern nothing in the record--and certainly nothing in the district court's opinion--that would support a conclusion that the inmates have shown a likelihood that they will succeed on their claim that Morrison officials have been deliberately indifferent to the dangers confronting inmates, or even that the inmates have raised a "grave question" that would justify the extraordinary relief ordered by the district court. The district court rested its conclusion that the inmates have shown a likelihood of success on this claim on the fact that "the defendants continue to contend the level of violence is not excessive" and on its own assessment that "only token measures to control the present violence" have been instituted. Order at 6.
 
 
 26
 Except in the most unusual case, testimony by prison officials that the level of violence is within acceptable limits is not appropriately considered affirmative evidence of deliberate indifference. Were it otherwise, prison officials could not even attempt to refute a claim that inmates were exposed to an unacceptable level of violence without ipso facto being found deliberately indifferent, as they were here. There is no evidence in the record before us to justify treating the Morrison officials' defense of their actions as affirmative evidence of indifference. To the contrary, as explained below, see infra at 273-74, there is every reason to believe that their vigorous defense was justifiable.
 
 
 27
 The district court also inappropriately, and ironically, viewed the numerous remedial steps undertaken or committed to be undertaken by the Morrison officials as affirmative evidence of deliberate indifference. Prior to the hearing, the officials made various attempts to address conditions at the prison. The officials assigned one intelligence officer to identify and track gang and predatory behavior, and another to review on a daily basis all incident reports and protective housing requests in order to identify incipient problems; temporarily reallocated nine correctional officer positions to Morrison to alleviate staff fatigue; spent over $300,000 in overtime pay in 1993 to ensure that all security posts were fully staffed at all times; encumbered approximately $2 million for improvements in the physical plant; restricted the wearing of jewelry by inmates to reduce incentives to violence; initiated regular, formal meetings between staff and supervisors to promote the exchange of information; introduced a requirement that all custody supervisors document that they had sought out and talked to at least three inmates per day; adopted a policy of "zero tolerance" for low-level incidents; and initiated group counseling on stress and anger management, group "complaint sessions," and a class on cultural diversity. J.A. at 181-87, 192-94, 406-12; Appellant's Br. at 32-33. These substantial remedial measures, if anything, confirm that the officials were willing and fully prepared to address the problems at Morrison. They are hardly "token measures" supporting a finding of deliberate indifference, as the district court characterized them without explanation.
 
 
 28
 At the hearing before the district court, Morrison officials notified the court of additional remedial steps planned for the near future. Significantly, three of the state's planned measures track closely features of the district court's order: Morrison's population was to be reduced to 265 inmates when the new Foothills Correctional Institution became operational only six weeks later, in May 1994; Morrison officials had already requested the creation of twenty new correctional officer positions; and dormitories were no longer to be used for housing inmates needing segregated housing, or any inmate with a history of violence against other inmates. J.A. at 175, 419, 429-30.
 
 
 29
 The inmates contend, and the district court apparently accepted, that the measures adopted prior to the hearing must be discounted because "each of these steps was taken after the class action lawsuit was filed," and that the planned measures must also be recognized as "mere intentions announced at the hearing, in a last-minute attempt to avoid injunction and refute the claim of indifference." Appellee's Br. at 39. Even if the inmates' characterization of the timing of these measures were accurate, which it is not,[4] their argument that these measures should be discounted would still be without force. Regardless of when such actions are undertaken or committed to be undertaken by responsible authorities, they constitute evidence of interest in and concern over the dangers to which inmate populations are always exposed.
 
 
 30
 The inmates' belated argument of mootness, premised on changes that have occurred at Morrison since issuance of the district court's order, lays to rest any remaining doubt that the inmates failed to raise a sufficient question over the level of concern evidenced by the Morrison officials.[5] The inmates concede that these changes do not represent a response to the preliminary injunction because we stayed the injunction even before prison officials had an opportunity to respond to its issuance. See Appellee's Suggestion of Mootness with Memorandum of Law at 5. If, as this motion suggests, the appellants have undertaken so many improvements in the last four months that the inmates' complaints have been largely, if not entirely, addressed, it is self-evident that the state was committed to meeting its constitutional obligations without federal judicial intervention.
 
 2.
 
 31
 Similarly suspect is the district court's conclusion--based largely on testimony from inmates--that the inmates have shown that they are exposed to an unconstitutional level of violence at Morrison. The district court found conclusorily that "[a]ssaults and fights between and among inmates result in disciplinary infractions at Morrison at five times the average rate for adult prisons in North Carolina" and that "the understaffed facility [at Morrison] is ill equipped to handle the potential, as well as, constant levels of violence." Id. at 2-3. The court, however, failed even to mention the prison officials' evidence that although young males such as those incarcerated at Morrison tend to fight each other more often than do older inmates incarcerated at adult prisons, they do so with an intensity less likely to cause harm. J.A. at 125, 192. Nor did the court discuss the inmates' own data on violence at the prison, the admissibility of which is in question, that reveals that during the previous forty-five months there was not a single death at Morrison due to violence, and that most altercations are one-on-one confrontations, rarely involving manufactured weapons. The court also failed to address the fact that the inmates' compilation of injury statistics, upon which the court apparently relied, included injuries that were self-inflicted, see, e.g., id. at 318, the result of accidents, see, e.g., id. at 288 (accidental fire), 290 (falling plaster), or sustained in escape attempts, see, e.g., id. at 304, as well as some incidents that involved no injury whatsoever, see, e.g., id. ("Found 4 gallons of homemade buck (liquor) buried in yard[.]"). Finally, the court nowhere attempted to reconcile its conclusion as to the level of violence at Morrison with the state's expert medical testimony that only ten of the sixty-five incidents designated by the inmates as "serious" (which, under the inmates' definition, included any injury requiring stitches) could properly be characterized as such, and that fewer than five of the injuries required overnight hospitalization. Id. at 449.[6]
 
 
 32
 Given this evidence, which the district court never addressed, it is difficult to conclude even that the inmates raised a "grave question" as to whether they are exposed to a substantial risk of serious injury, much less that they proved they are likely to succeed on this claim. In Shrader v. White, 761 F.2d 975 (4th Cir.1985), for example, the record showed there had been seven inmate murders, fifty-four stabbings, and twenty-four other serious inmate-on-inmate assaults at Virginia State Prison in the five years preceding trial. Notwithstanding this level of violence, the panel sustained the district court's determination that the prison was not marked by a pervasive risk of harm from violence, recognizing that "acts of violence by inmates against inmates are inevitable[, and] [n]o amount of money and no increase in the number of prison officers is going to completely eradicate inmate violence." Id. at 980. The level of prison violence at issue in Shrader obviously exceeded that at Morrison. If the violence in Shrader did not rise to the level of a constitutional violation, then it is doubtful that the violence at Morrison likely does. At bottom, the inmates' constitutional claim rests on statistics showing that, among a population of some 300 young felons, there is on average one reported altercation per week (and perhaps only one fight per month in the segregated dormitories) and sixty-five arguably serious injuries in forty-five months. As the record before the district court disclosed, these figures compare favorably, if regrettably, to the level of violence at large urban public schools in North Carolina. J.A. at 126-27, 155-70.[7]
 
 
 33
 We doubt that these conclusory findings by the district court, recited in support of its determination that the plaintiff inmates had shown a likelihood of success on the merits of their claims (or that they at least had raised a sufficient question as to warrant mandatory injunctive relief), could support even a generalized order of the kind appropriate after a finding on the merits that unconstitutional conditions exist. We have little difficulty concluding that such findings are inadequate to support the sweeping, mandatory preliminary injunctive relief ordered by the district court here.
 
 III.
 
 34
 Over the years, federal courts have "become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan." Bell v. Wolfish, 441 U.S. at 562, 99 S.Ct. at 1886. The district court in this case simply failed to undertake this most basic of inquiries. As a consequence, it did precisely what the Supreme Court has repeatedly admonished federal courts not to do. It injected itself into the internal operating affairs of Morrison without first providing the state's prison authorities an opportunity to redress the identified institutional deficiencies, contrary to established principles governing the equitable power of federal courts to order relief in the context of inmate suits challenging conditions of confinement. And the court compounded its error by relying upon little more than conclusory findings that would not have supported even a discreet order that preserved to the state officials the remedial power they properly possess. It was for these reasons that we stayed the preliminary injunction in April, and it is for these reasons that we vacate the injunction today.
 
 
 35
 SO ORDERED.
 
 
 
 [1]
 The Court overruled Procunier on different grounds in Thornburgh v. Abbott, 490 U.S. 401, 413-14, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989). However, Thornburgh specifically reaffirmed that portion of Procunier commanding federal courts to accord prison administrators and responsible executive and legislative officials the broadest possible latitude to manage state prisons consistent with the requirements of the Constitution. Id. at 407-08, 94 S.Ct. at 1878-79
 
 
 [2]
 Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances. Wetzel, 635 F.2d at 286; see also Citizens Concerned for Separation of Church and State v. Denver, 628 F.2d 1289, 1299 (10th Cir.1980), cert. denied 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981) ("It is fundamental that mandatory injunctive relief should be granted only under compelling circumstances inasmuch as it is a harsh remedial process not favored by the courts."); Martinez v. Mathews, 544 F.2d 1233, 1243 (5th Cir.1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.")
 
 
 [3]
 In this respect, the district court appears to have mistakenly believed that there exists a constitutional right to have a prison operate at the published standard operating capacity. It was on the basis of the standard operating capacity for Morrison that the district court ordered the reduction of the inmate population to 205
 
 
 [4]
 The court was informed of the state's plan to cease using dormitories for disciplinary segregation, as well as a plan to add more than 1,000 new beds to the Youth Command statewide within 18 months, in sworn affidavits filed in February, well before the preliminary injunction hearing. J.A. at 175 (affidavit of Lynn Phillips, Director of Prisons), 180 (affidavit of Michael E. Bumgarner, Youth Command Manager)
 
 
 [5]
 Notwithstanding that Morrison officials have complied with certain aspects of the district court order, we decline to dismiss this appeal as moot, for the Morrison officials have categorically refused to commit to the current inmate population levels ordered by the district court. Because the population cap imposed by the preliminary injunction would remain in effect throughout the pendency of the trial, the duration of which cannot be predicted, see, e.g., Ruiz v. Estelle, 503 F.Supp. 1265 (S.D. Tex.1980) (159 day trial), there exists a reasonable likelihood that Morrison will at some point be in violation of the injunction, as the prison officials frankly admitted at argument
 Furthermore, only the first of the measures ordered by the injunction is limited by an expiration date (the population cap of 205 inmates is to remain in place "until the final resolution of this action"). According to the terms of the district court's order, the other measures must be permanently adopted. Were we to dismiss this appeal as moot and allow the preliminary injunction to stand, therefore, Morrison officials would be obligated permanently to (1) staff correctional officer posts at specified locations within the institution, (2) forego the use of dormitories for disciplinary segregation, administrative segregation, or protective custody, and (3) perhaps provide "the amount of square feet required by the 1994 Supplement to the American Correctional Association Standards for inmates transferred from Morrison as a result of this order." Order at 7-8.
 Under United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the appeal therefore is not moot.
 
 
 [6]
 The district court made much of the fact that there had been, in its terms, "a serious disturbance" at the prison in May 1993. Even accepting that this incident amounted to a widespread disturbance, that a single incident of this relatively insignificant magnitude occurred is hardly evidence of a pervasive risk of serious injury. Despite the district court's surprising statements during the hearing that "violence [in prisons] isn't inevitable ... any more than it would be in school or the armed forces or anywhere else," J.A. at 417, it is virtually impossible to eliminate violence among the incarcerated, as we have frequently noted. See, e.g., Shrader v. White, 761 F.2d 975, 980 (4th Cir.1985)
 
 
 [7]
 This same evidence also seriously undermines the district court's companion conclusion that "the balance [of harms] is struck decidedly in favor of the plaintiffs." Order at 5. The district court not only overstated the harm to the inmates, but also all but ignored entirely the substantial harm to the state that attends federal judicial intervention in the state's internal processes, simplistically asserting that the only harm to the state would be the expenditure of additional funds. Id. The same oversight caused the district court to misperceive the degree to which the public interest is disserved when federal courts assume the role of state prison administrators