**Steven Howard OKEN, Plaintiff**

v.

**Frank C. SIZER, Jr., Commissioner, Maryland Division of Correction, et al., Defendants**

**No. CIV. PJM 04–1830.**

United States District Court, D. Maryland.

June 14, 2004.

Fred Warren Bennett, Michael Edward Lawlor, Bennett and Lawlor LLP, Green-belt, MD, David M. Barron, Law Office of David M. Barron, Columbia, SC, Jerome Howard Nickerson, Jr., Law Office of Jerome H. Nickerson, Baltimore, MD, for Plaintiff.

David P. Kennedy, Ann N. Bosse, Scott S. Oakley, Office of the Attorney General, Baltimore, MD, for Defendants.

*OPINION*

MESSITTE, District Judge.

I.

*Introduction*

In 1987, Steven Howard Oken murdered Dawn Marie Garvin in merciless fashion, shattering the lives of her family and friends forever. The suffering that this young woman underwent, that her family and friends have undergone since, is unimaginable.

Since his conviction of this crime and his sentence of death in 1991, in an effort to undo his conviction, Oken has pursued appeals, post-conviction proceedings, at least one federal habeas corpus proceeding (handled by this member of the Court), and yet further appeals, including to the U.S. Supreme Court. His guilt and conviction are now definitively established and he has exhausted all avenues of possible modification.

Oken comes before this Court in a different type of proceeding, a civil action in which he alleges a violation of his constitutional rights by reason of the manner in which his execution by lethal injection, scheduled to take place this week, will occur. Abandoning a number of other issues raised in his Complaint to this Court, Oken poses a single issue:

Whether Maryland's Execution Protocol, allegedly designed to prevent the barbiturate from leaking all over the death chamber floor, as occurred during the last lethal injection administered in the State, establishes an Eighth Amendment violation in that an unreasonable risk exists that Oken's executioners lack the requisite proficiency in establishing and maintaining an IV line capable of introducing all the barbiturate necessary to successfully produce his unconsciousness and that his executioners are deliberate-

ly indifferent to this critical requirement.

There is a subset of this issue, however, which pertains to the Execution Protocol that the State of Maryland intends to follow in carrying out his death sentence. Oken claims that the State unreasonably delayed in providing him just 3 days ago with a copy of its current Execution Protocol, which was amended as recently as May 26, 2004 (indeed, that Defendants have failed to furnish a copy of the full Protocol, some 16 pages having been omitted), and that he has therefore had insufficient time to review it with his counsel and medical expert.

Defendants, all corrections officials of the State of Maryland,[1] deny the validity of Oken's constitutional claim on the merits and raise several procedural defenses, among them:

- That this is not a proper § 1983 claim, but rather a successive habeas corpus claim, which is precluded without special leave of court;
- That the proceeding is barred by reason of the doctrine of *res judicata;*
- That with regard to the Execution Protocol, Oken's request for its production was untimely;
- That the State's recent production of the Amended Execution Protocol was not prejudicial to Oken because it made no substantive changes in the earlier protocol as to which Oken had ample notice.

The Court heard oral argument this afternoon and advised the parties that it would make no ruling on the merits of the claim, but would confine its consideration to the Motion for Stay. Accordingly, at this juncture only these issues need to be decided:

1) Is Oken's claim properly a § 1983 claim as opposed to a disguised successive habeas corpus petition?

2) Is the claim barred by *res judicata?*

3) Was Oken's request for the Execution Protocol untimely?

4) Was Oken prejudiced by the State's recent delivery of the Execution Protocol amended as of May 26, 2004?

## II.

### *Procedural History*

On January 29, 2003, the Circuit Court for Baltimore County denied Oken's motion to correct an illegal sentence in which he argued that Maryland's death penalty statute is unconstitutional because it imposes an improper burden of proof. *Oken v. State,* 378 Md. 179, 835 A.2d 1105 (2003). Oken appealed and on November 17, 2003, the Court of Appeals of Maryland denied relief. On December 15, the Court of Appeals denied Oken's Motion for Reconsideration. On April 26, 2004, the U.S. Supreme Court denied his Petition for Writ of Certiorari. *Oken v. Maryland,* — U.S. ——, 124 S.Ct. 2084, 158 L.Ed.2d 632 (2004). That same day, Judge John Grason Turnbull, II of the Circuit Court for Baltimore County signed a warrant for Oken's execution, directing that execution by lethal injection take place during a five-day period beginning today, June 14, 2004.

---

1. Defendant Frank Sizer, Jr. is the Commissioner, Maryland Division of Correction. Defendant William Williams is the Warden of the Maryland Correctional Adjustment Center where death row inmates are housed. Gary Hombaker is the Warden of the Metropolitan Transition Center where the execution will occur. Defendants, Unknown Executioners, are said to be employed or contracted by the Maryland Division of Correction to make preparations for, and carry out, the scheduled execution of Oken. They include, but are not limited to correctional officers, nursing assistants, and "executioners."

By letter to an Assistant Attorney General of Maryland, dated May 10, Oken's counsel sought production, *inter alia*, under the Maryland Public Information Act (MPIA), Md.Code Ann., State Gov't., § 10–611 *et seq.*, of the Execution Protocol that would be followed in his case. On May 12, the State responded, advising Oken's counsel that they would receive a response "within the reasonable period required by the Act."

On May 14, Oken filed a motion for appropriate relief in the Circuit Court for Baltimore County in which he asked the court to vacate the Warrant of Execution, alleging that the lethal injection process to be used in his case did not comport with the language of Section 3–905 of the Correctional Services Article of the Maryland Code.[2] Three days later, Oken filed a civil action in the Circuit Court for Baltimore City seeking temporary and permanent injunctive relief that would bar the State of Maryland from carrying out the execution as scheduled and a declaratory judgment that the Division of Correction's method of carrying out a lethal injection execution was unconstitutional and violative of Maryland statutory law.

Following a hearing on May 25, Judge Marcella A. Holland of the Circuit Court for Baltimore City ordered that Oken's civil action in the Circuit Court for Balti-more City be transferred to the Circuit Court for Baltimore County. On June 2, Judge Turnbull denied Oken's Motion for Appropriate Relief in his original Baltimore County case, and in the case transferred from Baltimore City, granted Defendants' Motion for Summary Judgment, necessarily denying Oken's request for stay of execution pending discovery. On June 7, Oken's appeal from that order was argued in the Maryland Court of Appeals. By per curiam order dated June 9, the Court of Appeals affirmed Judge Turnbull's decision in all respects. On Friday, June 11, Oken's counsel for the first time received a copy of the Execution Protocol that had been amended on May 26. Today, Monday, June 14, the present action in Federal Court was filed.

## III.

### § 1983 vs. Habeas Corpus Proceeding

The Court will not labor over this issue. It views the Supreme Court's recent decision in *Nelson v. Campbell*, —— U.S. ——, 124 S.Ct. 2117, 158 L.Ed.2d 924 (May 24, 2004) as dispositive. In *Nelson*, an Alabama inmate facing death by lethal injection brought a § 1983 action, claiming that the "cut-down" procedure that would be used to access his veins was cruel and unusual within the terms of the Eighth Amendment.[3] The state opposed the suit,

---

**2.** The Correctional Services Article, § 3–905(a), provides:

"(a) ... The manner of inflicting the punishment of death shall be the continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate or other similar drug in combination with a chemical paralytic agent until a licensed physician pronounces death according to accepted standards of medical practice."

Oken argued that the State of Maryland's method of performing lethal injections was incompatible with § 3–905(a). According to Oken, while the statute requires the continuous use of an ultrashort-acting barbiturate or

similar drug, Maryland in fact begins with the administration of a fixed amount of sodium pentothal (the barbiturate) followed by fixed amount of pavulon. The administration of the barbiturate is not, therefore, continuous. At the same time, a third drug, potassium chloride, is used, as opposed to the two drugs implied in the statute. These arguments were rejected by the Maryland Court of Appeals and are not before this Court.

**3.** A "cut-down" procedure involves making an incision in an individual's arm or leg for the purpose of gaining venous access, usually in an individual with compromised peripheral

principally on the grounds that it challenged the fact of the inmate's sentence, hence it could only be brought as a habeas corpus claim, which, without leave of court, would be barred as successive. The Supreme Court disagreed, noting that Nelson had been careful not to challenge lethal injection as a method of execution in general, but only "as applied" to him, *i.e.* through use of the cut-down procedure. The Court acknowledged (and the State of Alabama conceded) that, had the cut-down procedure been used in a non-death setting involving a prisoner, the Eighth Amendment would clearly have applied. "We see no reason on the face of the complaint," said the Court, "to treat petitioner's claim differently solely because he has been condemned to die." 124 S.Ct. at 2123. In effect, the Court viewed the challenge to the cut-down procedure as a challenge to a condition of confinement, well within the province of a § 1983 action, as opposed to a challenge to the fact or duration of his sentence, which could only be raised by habeas.

■ This Court views a challenge to the manner of administration of an IV in a death setting as little different from its administration in a non-death setting. Both instances involve inserting an IV into the individual, infusing chemicals, monitoring vital signs, and making appropriate adjustments as circumstances may require. The procedures relate to each other in much the same fashion as a cut-down procedure in a non-death setting relates to such a procedure in a death setting.

Accordingly, the Court understands Oken's challenge to be to a condition of his confinement, not to the fact of his conviction. As such, it qualifies as a § 1983 action.

## IV.

### Res Judicata

Defendants argue that *res judicata* bars this action since Oken asserted the deficiencies of the Execution Protocol in the State court action he filed in May, which resulted in summary judgment in favor of Defendants on that and all other issues.

■ Defendants invite the Court's attention to familiar legal authority. Thus, they say, the preclusive effect given by a federal court to a prior state court judgment is to be determined by the law of the state. *E.g., Migra v. Warren City Sch. Dist. Bd. of Ed.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Under Maryland law, a prior court decision between the same parties has full preclusive effect with respect to claims that were brought, or could have been brought, in the earlier action. *See Colandrea v. Wilde Lake Comm. Ass'n,* 361 Md. 371, 392, 761 A.2d 899, 910 (2000) ("[A] judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action and is conclusive, not only as to all matters decided in the original suit, *but also as to matters that could have been litigated in the original suit.*") (emphasis is original). Because Oken has litigated these same claims in a state court action, he is barred from bringing them again in this Court.

Oken responds with citation to equally familiar legal authority.

■ *Res judicata* bars a litigant from bringing a claim in a § 1983 action only where the state court has given the parties a full and fair opportunity to litigate federal claims and the state proceedings satisfy

veins. In *Nelson,* the State of Alabama's "cut-down" procedure required prison personnel to make a 2–inch incision in Nelson's arm or leg one hour before the scheduled execution while under local anesthesia. 124 S.Ct at 2121.

procedural due process requirements. *Migra,* 465 U.S. at 82 n. 5, 104 S.Ct. 892; *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Kremer v. Chemical Contr. Corp.,* 456 U.S. 461, 485, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). The Supreme Court, he says, has clearly stated that "[re]determination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States,* 440 U.S. 147, 164 n. 11, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). Here there are substantial reasons to doubt the quality, extensiveness, or fairness of procedures used in the state court.

Oken argues that the state court proceedings were procedurally unfair for at least two reasons. First, the state denied him adequate discovery to litigate his claims in state court and such a denial of discovery prior to the state court proceedings is precisely the kind of procedural defect that will defeat the defense of *res judicata.* For example, in *West v. Ruff,* 961 F.2d 1064, 1066 (2d Cir.1992), the court cited the lack of sufficient discovery as one of the, reasons why the plaintiff lacked a full and fair opportunity to litigate his claim in state court. *See also, Jorden v. Nat'l Guard Bureau,* 877 F.2d 245, 250 n. 21 (3d Cir.1989) (declining to give preclusive effect to prior proceeding where defendant not afforded adequate discovery). Here, Oken did not receive the information he sought about the Maryland execution protocol until long after the state court proceedings had been completed. Second, the state court proceedings were far from extensive. The Circuit Court, after hearings lasting a matter of minutes, summarily granted summary judgment in a one line order even though there were material facts in dispute.

Having been denied discovery and an opportunity to develop an appropriate rec-ord, Oken contends that he was denied the full and fair hearing requisite to a finding of the *res judicata* bar.

■ While the Court does not agree that the *res judicata* bar is inapplicable merely because a litigant may have suffered summary judgment in the prior proceeding, even without the benefit of discovery, *see Weston Funding Corp. v. Lafayette Towers, Inc.,* 550 F.2d 710, 713 (2d Cir.1977) (mere fact that prior decision on the merits was reached by summary judgment does not preclude a later finding of *res judicata* ); *Gilbert v. Bach,* 697 F.Supp. 202, 203 (D.Md.1988) (same), a second point is more telling. The Amended Execution Protocol that Defendants formulated as of May 26, 2004, was neither available to the Baltimore Circuit Court when it denied Oken's Motion for Stay on June 2, nor indeed—even though it existed as of June 7 when the parties argued for a stay in the Maryland Court of Appeals—was it apparently made available in that court. In consequence, Oken never had the opportunity to challenge the Execution Protocol—old or new—except insofar as he was obliged to rely on the affidavit of a prison official as to what the Protocol provided. Access to the Protocol, however, as the Court explains *infra,* was Oken's entitlement as a matter of fundamental fairness, if not due process. Because, for whatever reasons, Defendants withheld the Amended Execution Protocol during Oken's attempt to persuade the state's courts to stay his execution, they denied him the right to even the minimal hearing that might have permitted him to defeat their motion for summary judgment. Defendants will not now be heard to say that Oken is precluded from presenting a possible claim based on the late-delivered Amended Execution Protocol in this Court.

## V.

*Timeliness of Oken's Request for Execution Protocol/Prejudice From Lateness of State's Production*

Defendants rely heavily on the argument that Oken could have raised his challenge to any aspect of the State's lethal injection procedure years ago, perhaps as early as 1994 when Maryland converted from lethal gas to lethal injection as its method of execution. Even a year ago or several months ago, say Defendants, would have been timely, but not 29 days prior to Oken's scheduled week of execution.

■ Oken offers a number of explanations in response, some more convincing than others,[4] but one point, in the Court's view, trumps all others. Because the State's Execution Protocol was amended as recently as May 26, 2004, it would have made little difference whether Oken's request had come any time before that date. As of that date, a different Protocol was put in place and, whatever changes it might contain, Oken was entitled to review it with his counsel and medical expert and attempt to challenge it. It can hardly be said that the filing of suit in this Court today, June 14, 2004, the Monday following the Friday that Oken's attorneys first received the Amended Execution Protocol, was untimely.

Still, Defendants insist, the Amended Execution Protocol made no substantive changes in the old and since Oken knew (or should have known) what the old Protocol said, he was not prejudiced thereby and should not be permitted to use this Eleventh Hour "hook" (defense counsel's word) to avoid his fate.

Defendants ask too much of Oken and of the Court. They ask that it be taken on faith, first, what the old Protocol consisted of, based solely on the affidavit of a prison official as to what it contained. They then ask that the word of that official and of counsel at oral argument be taken to establish that whatever changes were made in the amendments were merely procedural and not substantive. Both propositions are inadmissible and without any legal basis that the Court can conceive of.

Fundamental fairness, if not due process, requires that the execution protocol that will regulate an inmate's death be forwarded to him in prompt and timely fashion. While the Court has located no cases specifically establishing a right of production, it is clear that in innumerable death penalty cases the execution protocols have been examined by courts for their compliance with constitutional requirements. *See, e.g., Nelson,* 124 S.Ct. 2117; *In re Williams,* 359 F.3d 811 (6th Cir. 2004); *Poland v. Stewart,* 117 F.3d 1094 (9th Cir.1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1533, 140 L.Ed.2d 683; *Campbell v. Wood,* 18 F.3d 662 (9th Cir.1994), *cert. denied,* 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682; *Cooper v. Rimmer,* 2004 WL 231325 (N.D.Cal.2004), *aff'd,* 358 F.3d 655; *Cal. First Amendment Coalition v. Woodford,* 2000 WL 33173913 (N.D.Cal.2000), *aff'd,* 299 F.3d 868; *Jones v. McAndrew,* 996 F.Supp. 1439 (N.D.Fl.1998); *LaGrand v. Lewis,* 883 F.Supp. 469 (D.Ariz.1995), *cert. denied,* 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343. Obviously, the fact of court review of the protocols presupposes their production.

---

4. The Court, for example, finds the fact that the Supreme Court announced its holding in *Nelson* on May 24, 2004, a convincing justification for delay on Oken's part. Until that date, it was very much up in the air whether a challenge to a method of execution, even as applied, could be brought in a § 1983 action as opposed to a much more difficult successive habeas petition. The Supreme Court's decision in *Nelson* made clear that a § 1983 action, at least under some circumstances, properly lies. 124 S.Ct. at 2122.

Due process requires nothing less—an opportunity to receive notice of how one's rights will be affected and opportunity to respond and be heard. *Cf. Mullane v. Central Hanover Bank*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).[5]

Oken is entitled to show—or at least to attempt to show—how his rights have been affected by the changes in the Execution Protocol. If the recent changes were indeed procedural, it may well be that Oken cannot succeed. *Cf. Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir.1997); *McKenzie v. Day*, 57 F.3d 1461, 1469 (9th Cir.1995). On the other hand, if the changes affect a substantial right, he may have a valid claim. *Cf. Collins v. Youngblood*, 497 U.S. 37, 40–41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).

In any event, Oken was and is entitled to review the full Protocol itself. He is not limited to taking Defendants' word that his rights will not be violated by what they propose to do.

The Court finds Oken's request of the Execution Protocol was timely. It finds further that he was prejudiced by Defendants' late, last-minute production of the document.

## VI.

The Court turns to a consideration of the factors relevant to a grant *vel non* of a stay of execution in this case. Its conclusion should come as no surprise.

The Supreme Court in *Nelson* set out the factors relevant to the grant of a stay in these circumstances:

> Thus, before granting a stay, a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim. Given the State's significant interest in enforcing its criminal judgments, see *Blodgett*, 502 U.S., at 239, 112 S.Ct. 674, 116 L.Ed.2d 669; *McCleskey*, 499 U.S., at 491, 111 S.Ct. 1454, 113 L.Ed.2d 517, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration

---

5. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278; *Grannis v. Ordean*, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363; *Priest v. Board of Trustees of Town of Las Vegas*, 232 U.S. 604, 34 S.Ct. 443, 58 L.Ed. 751; *Roller v. Holly*, 176 U.S. 398, 20 S.Ct. 410, 44 L.Ed. 520. The notice must be of such nature as reasonably to convey the required information, *Grannis v. Ordean, supra*, and it must afford a reasonable time for those interested to make their appearance, *Roller v. Holly, supra*, and *Cf. Goodrich v. Ferris*, 214 U.S. 71, 29 S.Ct. 580, 53 L.Ed. 914 (1909).

\* \* \* \* \* \*

But when notice is a person's due, process which is a mere gesture is not due process.

The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonable certain to inform those affected..." *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)(parallel citations omitted).

In particular, inmates facing the death penalty are entitled to notice when there has been a post-conviction change in mode of execution. See, e.g., *Stewart v. LaGrand*, 526 U.S. 115, 119, 119 S.Ct. 1018, 143 L.Ed.2d 196 (1999); *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir.1997); *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir.1998); *Sims v. Florida*, 754 So.2d 657, 665 (Fla.2000); *DeShields v. State*, 534 A.2d 630, 639 n. 7 (Del.1987); *Wetzel v. Wiggins*, 226 Miss. 671, 85 So.2d 469, 471 (1956); *State v. Fitzpatrick*, 211 Mont. 341, 684 P.2d 1112, 1113 (1984).

of the merits without requiring entry of a stay.

124 S.Ct. at 2126.

The parties agree that, insofar as the law in the Fourth Circuit is concerned, these factors are not of equal weight. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991). "If the hardship balance tilts sharply in the plaintiff's favor, the required proof of likelihood of success is substantially reduced." *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 817 (4th Cir.1991).

The Court considers the factors in this case:

As to the balance of hardship, Oken contends:

First, if the injunction is not granted, he will suffer irreparable injury because he will be executed before the merits of his cogent claim is addressed. *See Wainwright v. Booker*, 473 U.S. 935, 935 n. 1, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985) (Powell, J., concurring) (recognizing that there is little doubt that a prisoner facing execution will suffer irreparable injury if the stay is not granted). Second, says Oken, the injunction will do no harm to Defendants because there is no fear of the state's judgment being avoided or denied; in fact, plaintiff does not seek such relief. All he seeks is a death in "accord with the dignity of man, which is the basic concept underlying the Eighth Amendment." *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (internal citations omitted).

Defendants characterize the relative hardships this way:

While the irreparable harm to one seeking a stay of execution is ordinarily obvious, Oken is not contesting the right of the State eventually to execute him. He only challenges the presently planned manner of execution. Therefore, the true measure of the likelihood of irreparable harm to Oken is the chance that his execution by lethal injection as now planned will be unconstitutionally painful. That chance is minimal.

On the other hand, the likelihood of harm to Defendants is substantial. The State has a significant interest in enforcing its criminal judgments. *Nelson*, 124 S.Ct. at 2126. The public also has an interest in state criminal sanctions being administered by the persons authorized to do so because of their training and experience, not by the federal courts. *See Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir.1994) ("It is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities.")

Moreover, since the enactment of the Prisoner Litigation Reform Act in 1995 (if not before, *see Lewis v. Casey*, 518 U.S. 343, 354, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (vacating system-wide injunction relating to provision of legal materials and services in absence of actual deprivation of access except in isolated cases); *Taylor*, 34 F.3d at 269 (decrying breadth and detail of injunctive relief based on insufficient preliminary findings of violations and without giving prison officials first opportunity to craft remedy)), federal courts issuing injunctive relief in prisoner cases have been under the additional requirement that they "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of a Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1) & (2) (2000). Under the PLRA, federal courts are prohibited from

becoming involved in the actions of the state's correctional system absent compelling reasons. A court considering whether to grant injunctive relief in a prisoner case must give substantial weight to any adverse impact on public safety or the operation of the criminal justice system. *Id.*

■ Finally, say Defendants, the Supreme Court in Nelson reiterated that the last-minute nature of a request for a stay of execution is a factor to be considered in determining whether to grant that particular form of equitable relief. Because of the state's interest in carrying out its criminal judgments, there is a "strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson,* 124 S.Ct. at 2126.

■ The Court concludes that, on balance, the greater hardship would be suffered by Oken who will otherwise die this week, rather than by Defendants, who remain able to execute him in appropriate fashion in proper time.

The issue of likelihood of success on the merits, therefore, is reduced insofar as what Oken is required to show in order to obtain a stay, so long as he presents a substantial and serious issue.[6] The issue of Oken's likelihood on success on the merits, indeed whether a substantial and seri-

ous issue is present, is difficult to assess at this time. The Court is not prepared to say that Oken is likely to prevail in establishing that the manner in which the State of Maryland would administer a lethal injection to him constitutes a cruel and unusual punishment or even, as he might argue hereafter, that the issue he raises is sufficiently serious and substantial as to merit a further stay. But Defendants themselves contributed to this state of affairs by their last minute amendment of the Execution Protocol and by their even later delivery of a copy of that Protocol (moreover, incomplete Protocol) to Oken's counsel.

The Court understands that, while it must consider whether certain methods of execution, as applied, raise possible constitutional questions, some issues raised may be so frivolous that it is possible, consistent with *Nelson,* for the Court to dismiss these claims without allowing any discovery or even a response from the State. 124 S.Ct. at 2126. This is not one of those cases. Here the issue is a condemned man's right to have reasonable access to the Execution Protocol that will be applied in his case, to review it with his counsel and his medical expert, and to determine whether there are appropriate challenges to make to it based on Eighth Amendment grounds.[7]

**6.** As for the public interest, the Court concludes that consideration of this factor is evenly balanced between the parties. The State has strong interest in seeing the fulfillment of its legal judgments. Individuals, on the other hand, are entitled to "die with dignity," at least consistent with the requirements of the Eighth Amendment. At a minimum, they are entitled to be able to make that argument.

**7.** Given the late delivery of the Amended Protocol to defense counsel, Oken's counsel had extremely limited time to review the Amended Protocol with Oken's expert, Dr. Heath. However, at oral argument held today, coun-

sel for Oken gave some idea of what Dr. Heath might be able to say in response to the Amended Protocol, having discussed the matter with him by telephone that morning. See *Appendix A* (partial transcript of Attorney Jerome Nickerson's argument to the Court, 6/14/04).

One indication that the Amended Protocol might bear directly on Oken's claim that administration of the IV is problematic, constitutionally or otherwise, is Defendant's recent concession that, during the last execution by lethal injection in this State, that of Tyrone

The Court concludes that Oken is entitled to a complete copy of the State's Amended Execution Protocol, that the Protocol could and should have been made available to him on the earliest possible date, *i.e.* on May 26, 2004, or certainly no more than a day or two thereafter. The State's delay in providing the Protocol to Oken, moreover, which coincided with the decision of the Maryland Court of Appeals' denial of Oken's Motion for Stay, is troubling. The Court is left to wonder whether, if the Maryland Court of Appeals had received a copy of the Amended Protocol (it is not even clear whether the Maryland Court of Appeals was even advised that the Protocol was in the process of amendment), its decision regarding the stay might have been different. Only after that court ruled was the Amended Protocol sent to Oken's counsel and then—whereas, earlier pleadings had apparently been delivered by courier—it apparently was sent by ordinary mail.

The Court is deeply solicitous of the family and friends of Dawn Marie Garvin and acknowledges their desire, after so many years, to see closure in this case. Nevertheless it is the Court's duty, strongly reinforced in light of current world events, to see that the guarantees of the U.S. Constitution are respected, even in the case of someone who may be despised by the entire polity.

For the foregoing reasons, the Court will enter a STAY of the Warrant of Execution pending further Order of the Court.

## VII.

The following Order, in the Court's view, is consistent with the requirements of the PLRA, in that it extends no further than to correct the violation of a federal right, namely, the right of a death penalty in-

mate to have timely access to the Protocol that will determine the manner of his death. It will not have any impact on public safety or the operation of the criminal justice system.

The State of Maryland is directed to provide to Oken's counsel, within 48 hours, a complete set of the Amended Execution Protocol, which may be delivered on a confidential basis for Oken's counsel's eyes only (to be discussed with Oken, but not left with him). Thereafter, Oken's counsel shall have 10 days in which to file an appropriate pleading and affidavits challenging any aspect of the said Amended Execution Protocol on Eighth Amendment grounds. Defendants shall have 10 days thereafter to file an opposition, including rebuttal affidavits. Oken shall then have 5 days to file a reply memorandum.

The matter shall be set for further argument on July 19, 2004, at 10:00 a.m.

A separate Order will be ENTERED.

## APPENDIX A

### Partial Transcript of Attorney Jerome Nickerson's Argument to the Court, 6/14/04

*THE COURT:* Go ahead. I want to know, while we're on this, though, I'd like to know what your perception is about these new protocols versus the old, and why you think you're prejudiced by what the new protocol says as opposed to what your earlier affidavit says.

*MR. NICKERSON:* Yes, sir. Part of it and let me just address that part of it for Your Honor. Part of it, Judge, is I don't know who these guys are. I don't know who unknown executions are. I don't know their base level of training. I don't know if it was a guy showing up and saying, You're not on the execution team.

Gilliam in 1998, the IV in fact was maladministered and dripped.

And the guy who had his job before said, This is how we do it. This is how we've always done it or whether or not this person has some knowledge. Was he an EMT? How many times did he tray and stick somebody? Does he have proficiency in this kind of thing? How many times does he takes extension sets and put them together? How many times does he put a pressure bag over a IV -

THE COURT: Is that not in the protocol? Is that in the protocol?

MR. NICKERSON: That's in the new protocol. Not in the old protocol, in the new protocol.

Training is a huge issue, a huge issue. I just want something more than, Don't worry about it, they're trained. I want something more than, Don't worry about it, they're trained, because all I get are these conclusory assertions. What I want to know is, I mean, this is where the unnecessary risks takes place. There's no reason for them to use the extension sets. There's no reason for them to use the pressure bag. There's no reason in the world, Judge, no reason in the world why they can't infuse that line under pressure and see if they have a leak. It's just not.

Some of the protocols are the same. Others have changed. The quantities have changed, the state told you, Well, there's no real confusion on that one. In the new protocols, Judge, there is confusion. It's the lethal ingestion checklist, contents of syringe. This is from the new one. Although the execution manual says it was developed on May 26, this document actually says it was revised on June 8th, 2004.

They say 4.5 grams Sodium Pentothal, color marked red. And then at the very bottom, total injection, they say, they say 3 grams Sodium Pentothal, Sodium Pentothal.

There's also an error with respect to Pavulon on this page. They are claiming that they are injecting 10 milequivalence of Pavulon. There's no way they're injecting 10 milequivalence of Pavulon. They're injecting 12 micrograms of Pavulon.

This is the most important document that the State of Maryland will generate because it has to do with the taking of human life. They're changing it at the last minute. They're inconsistent on quantities. They don't have the right stuff down and they don't have the procedures to do this.

And let me just jump, Your Honor, to some of the stuff, if I may. If I heard the Assistant Attorney General correctly, he said, Well, they detected that they had a bad line going on Mr. Gilliam's arm and they switched to the other arm.

Judge, that means they had two bad lines on Mr. Gilliam. That's what it means.

Mr. Oken has never asserted he's entitled to absolute certainty. We just need more than these guys are doing.

Judge, these employees with the Maryland Department of Corrections, they are good men and women attempting to serve their state and their orders. We're not saying they're bad. We do need to look at things that have happened. We can't, we can't— we have a prior known condition. I have the number one expert in the country telling me, their new protocols have more problems.

We just need to sit down and talk just like Nelson. I mean, they worked it out. They haven't been able to—they haven't been willing to talk to us and they don't want to share protocols with us and I don't understand. Because we want them to do good government. We want this execution to be humane.

I watched men die in Maryland, in South Carolina and in Florida. I know when it's

time for my client to die. I don't stand in front of a Court and waste its time.

## ORDER

In consideration of Plaintiff Steven Oken's Motion for Stay of Execution and Defendants' Opposition thereto, it is for the reasons stated in the accompanying Opinion, this 14th day of June, 2004

ORDERED:

1) The Warrant of Execution of the Circuit Court for Baltimore County is hereby STAYED pending further Order of this Court;

2) As set forth in the accompanying Opinion, Defendants shall provide a full set of its current Execution Protocol to Oken's counsel by no later than June 16, 2004;

3) Within 10 days thereafter, Oken shall file a Supplemental Motion and supporting affidavits in response to said Execution Protocol;

4) Within an additional 10 days thereafter, Defendants shall file their Opposition to the said Supplemental Motion with supporting affidavits;

5) Within an additional 5 days thereafter, Oken shall file a Reply to said Opposition;

6) Further oral argument shall be held in this case on July 19, 2004, at 10:00 a.m.